UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.    23-30045 |
| ACJK, Inc., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| ACJK, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No.    23-03026 |
| | ) | |
| SMALL BUSINESS FINANCIAL | ) | |
| SOLUTIONS, LLC, and | ) | |
| RAPID FINANCIAL SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N

Before the Court is the Defendants' Motion to Dismiss the Plaintiff's Fourth
Amended Complaint. For the reasons set forth herein, the Motion to Dismiss will
be granted, in part, and denied, in part. Counts II, III, IV, V, VI, VII, and VIII will
be dismissed with prejudice. The case will proceed as to Count I against both
Defendants.

## I.    Factual Background

ACJK, Inc. ("Debtor"), a corporation that operated a pharmacy in Granite
City, Illinois, commenced its voluntary Chapter 11 case on January 30, 2023, by
filing a bare-bones petition. The Debtor's schedules and other required
documents were filed a month later. On Schedule D: Creditors Who Have Claims

Secured by Property, the Debtor listed "Rapid Finance" as being owed $59,140.18 secured—along with debts of several other creditors—by the pharmacy's inventory valued at $238,000. The debt was marked by the Debtor as being "disputed." The Debtor also listed "Rapid Finance/Prosperum c/o Howard Townsell," "Rapid Financial Services, LLC d/b/a Rapid Finance," and "Rapid Financial Services, LLC d/b/a Small Business Financial Solutions, LLC" as entities related to Rapid Finance and entitled to notice. Small Business Financial Solutions, LLC ("SBFS") was not scheduled as a creditor but nevertheless filed a proof of claim on April 10, 2023, for unsecured debt in the amount of $56,723.05. Rapid Finance was not mentioned in the proof of claim filed by SBFS, and Rapid Finance never filed its own proof of claim.

The Debtor's second amended Chapter 11 plan was confirmed on March 5, 2024. The plan defined "Rapid Finance" as "Rapid Financial Services, LLC d/b/a/ Rapid Finance and Small Business Financial Solutions, LLC." The plan provided that the value of the Debtor's assets was insufficient to fully secure the claims of creditors it asserted were superior to Rapid Finance's claim. Thus, the plan further provided that the claim of Rapid Finance would be treated as unsecured. No specific reference to the claim filed by SBFS was included in the plan.

A few weeks later, the Debtor filed an objection to the proof of claim filed by "Small Business Financial Solutions, LLC d/b/a Rapid Financial Services, LLC . . . in the amount of $56,723.05 as an unsecured claim." SBFS, in turn, filed an amended claim for the same amount, unsecured, and again did not

mention Rapid Finance. The Debtor then objected to the amended claim. That objection remains pending.

On November 15, 2023, the Debtor commenced this adversary proceeding against SBFS and Rapid Financial Services, LLC ("Rapid") based on a dispute over an alleged amendment to the Debtor's loan agreement with SBFS and a separate, ill-fated agreement with third-party Walgreens for the sale of the Debtor's business and assets. The Debtor contends that SBFS and Rapid ("Defendants") are responsible for the collapse of the Walgreens deal. The Defendants jointly answered the original complaint, together acknowledging the business relationship with the Debtor and admitting, among other things, that they had entered into an amended agreement that was binding and enforceable as to each of them and the Debtor. The Defendants, however, denied the substantive allegations about the terms of the agreement and denied that they were liable to the Debtor for the collapse of the Walgreens deal. They raised several affirmative defenses, including failure to state a claim upon which relief can be granted. The Debtor thereafter twice sought leave to amend the complaint to elaborate on the details of its agreement with Walgreens and to develop its claim of damages, culminating in a second amended complaint that the Defendants then moved to dismiss.

After the motion to dismiss the second amended complaint was briefed by the parties, the Court entered an Opinion and Order dated September 4, 2024, dismissing several counts of the second amended complaint without prejudice and setting forth the reasons for the decision. *ACJK, Inc. v. Small Bus. Fin. Sols.,*

*LLC (In re ACJK, Inc.),* 2024 WL 4047140, at *1 (Bankr. S.D. Ill. Sept. 4, 2024). Specifically, the Court dismissed counts for promissory estoppel and avoidance of fraudulent transfer as to both Defendants and counts for avoidance of preference and equitable subordination as to Rapid. The preference and equitable subordination counts survived as to SBFS based on allegations that SBFS was a creditor that received payments from the Debtor outside the ordinary course of the parties' dealings. The breach of contract count survived as to both Defendants based primarily on their admission in their jointly filed answer to the original complaint that they had entered into an amended agreement that was binding and enforceable as to each of them and the Debtor.

The Debtor filed a third amended complaint asserting its claim for breach of contract against both Defendants and claims for avoidance of preference and equitable subordination against SBFS alone. In addition, the third amended complaint asserted for the first time a claim for tortious interference with business expectancy against both Defendants. A week after filing the third amended complaint, counsel for the Debtor moved to withdraw as attorney. The motion to withdraw was granted after hearing. The order allowing the withdrawal set a deadline for the Debtor to obtain new counsel and scheduled a status hearing for December 5, 2024. The order also outlined the Court's expectations that any new counsel be fully acquainted with the Court's Opinion on dismissal of the second amended complaint and be prepared to adopt and prosecute the third amended complaint filed by the prior attorney or promptly file a fourth amended complaint.

Meanwhile, a separate proceeding was filed against SBFS and Rapid by the Chapter 13 trustee in the individual bankruptcy case of the principals of the Debtor here.[1] The three-count complaint asserted claims for the avoidance and recovery of a $15,754 payment alleged to have been made to SBFS and Rapid by the Debtor's principals, Albert and Cheryl Pelate, from their personal bank account. The allegations as to the source of the payment directly contradicted those made in all four iterations of the Debtor's prior complaints in this proceeding. When SBFS and Rapid did not respond to the Chapter 13 trustee's complaint, the Court set the matter for status hearing.

At the status hearing held December 5, 2024, proposed counsel for the Debtor in the present litigation expressed his intention to file a fourth amended complaint once his pending employment application was approved. The Court said it would set the matter for further status hearing but first noted the issues it saw with the Chapter 13 trustee now having commenced an adversary proceeding against the same defendants, based on the same transaction, but asserting key factual allegations that contradicted those asserted by the Debtor in this proceeding. The Court expressed concern that, after two years and several amendments to the complaint brought by the Debtor, there appeared to be confusion about who had made the payment at issue. Counsel for the Debtor in the underlying Chapter 11 case—who was also involved in negotiating the Walgreens transaction—addressed the Court's concerns by explaining that the

---

[1] The proceeding was captioned *Simon v. Small Business Financial Solutions LLC, et al.,* adversary case no. 24-03026, and was filed within the bankruptcy of *Albert Daniel Pelate and Cheryl Lynette Pelate,* case no. 23-30229.

payment was indeed made from the Pelates' personal bank account and acknowledging that the right of action to recover the payment from the Defendants was probably personal to them. The attorney for the Chapter 13 trustee confirmed that records showed that the Pelates—not the Debtor here—made the payment at issue. The Court also noted other issues with both complaints, encouraging all parties to take a close look at what happened based on available facts and the legal posture of the cases before moving forward in either proceeding. A continued status hearing in both adversary proceedings was scheduled for January 2025.

Thereafter, the Chapter 13 trustee filed a motion to voluntarily dismiss his proceeding against SBFS and Rapid, which the Court granted. At the January 2025 status hearing in this proceeding brought by the Debtor, newly-employed counsel for the Debtor informed the Court that he was prepared to file an amended complaint removing some counts and adding others. The Court set the pending third amended complaint for further status hearing in February 2025 with the expectation that the Debtor's counsel would file a motion for leave to file a fourth amended complaint soon enough that it could be set for the same hearing date. The Court also explained that it would likely be the last opportunity to amend the complaint and that dismissal at this juncture would likely be with prejudice. Before the hearing was concluded, the Debtor's counsel suggested that he might file a motion to voluntarily dismiss the proceeding and pursue available relief in state court rather than file an amended complaint. The Court noted potential issues with that approach but encouraged counsel to pursue

whatever relief he deemed appropriate in a timely manner so that it could be taken up at the next status hearing.

Consistent with his comments at the status hearing, the Debtor's counsel filed a motion to voluntarily dismiss the adversary proceeding pursuant to Bankruptcy Rule 7041. The motion stated the Debtor's intention to pursue pre-petition state law causes of action in state court and asked that dismissal be without prejudice, suggesting the Debtor could possibly refile a complaint in this court for the bankruptcy causes of action down the road.

At the hearing on the motion to dismiss, the Court noted the time the case had been pending, that the bankruptcy causes of action, if dismissed, would likely be barred from refiling by the statute of limitations, and that it was not entirely clear that dismissal of the state law causes of action would not also have prejudicial effect. The Court also noted the Debtor's pending objection to SBFS's proof of claim and questioned whether leaving that objection pending would preclude the issues raised in the objection from being litigated at the same time in another forum. Counsel for the Defendants argued that dismissal should be with prejudice and asked for an opportunity to respond to the motion to dismiss in writing. Counsel for the Debtor said he would be inclined to abandon the request for voluntary dismissal and instead proceed with the adversary proceeding if dismissal were to be with prejudice. Based on the discussion at the hearing, the Court set deadlines for further submissions.

The Defendants filed their objection to the motion to voluntarily dismiss. In response, the Debtor filed a combined reply and request to withdraw its

motion for voluntary dismissal. The Debtor also filed a motion for leave to file a fourth amended complaint with the proposed amended complaint attached. Both matters were set for hearing. At an April 22, 2025, hearing on the motion to withdraw the motion for voluntary dismissal and motion for leave to file fourth amended complaint, the Court expressed frustration about a glaring error in the proposed fourth amended complaint attached to the motion for leave: it continued to allege that the Debtor had made the $15,754 payment, notwithstanding the revelation at the December 2024 hearing that the Pelates had made the payment from personal funds. Counsel for the Debtor, who was present at the December 2024 hearing, conceded that he simply took the allegations from prior iterations of the complaint without accounting for the new information and asked for an opportunity to further amend the complaint before filing. The Court expressed concern at the continued failure to carefully investigate and plead and was disinclined to grant leave to file an amended complaint without the proposed amendment first being filed. The Debtor was given additional time to file an amended motion for leave to file with a new proposed amended complaint attached and was admonished that, given the time the case had been pending without due attention paid to the inaccuracies and problems in each of the prior amendments, the corrected complaint needed to be the final draft.

The Debtor subsequently filed its amended motion for leave to file a fourth amended complaint with the proposed complaint attached. At a hearing held May 7, 2025, the Court granted the outstanding request to withdraw the motion

for voluntary dismissal and granted the amended motion for leave. The Debtor filed its Fourth Amended Complaint later that day. In response to the Fourth Amended Complaint, the Defendants filed the Motion to Dismiss that is now before the Court.

The Fourth Amended Complaint identifies the Debtor as an Illinois corporation owned by Albert and Cheryl Pelate with Albert owning 51% of the shares and Cheryl owning 49% of the shares. Defendant SBFS is described as a Delaware limited liability company that filed a claim in the Debtor's bankruptcy, and Defendant Rapid is described as a Delaware limited liability company and "affiliated entity of SBFS" that was scheduled as a creditor in the Debtor's bankruptcy. The Defendants are collectively referred to in the complaint as "Creditors." The Fourth Amended Complaint alleges that, in May 2022, the Debtor entered into a loan agreement with SBFS under which SBFS extended $100,000 to the Debtor in exchange for a security interest in the Debtor's inventory and other collateral, as well as the Debtor's agreement to make regular installment payments to SBFS until the loan was repaid. SBFS filed a UCC-1 financing statement to perfect its lien on the collateral.

In December 2022, the Debtor entered into an asset purchase agreement with Walgreens for the Debtor's customer base and inventory in exchange for approximately $1,275,000, some of which would be paid at closing and the remainder after closing if certain contingencies occurred. The asset purchase agreement also required the Debtor "to ensure the removal of all existing liens on its pharmacy assets prior to the closing date." Because SBFS had a perfected

lien on assets subject to sale, the Debtor sought to renegotiate the loan agreement and obtain a release of the related lien.

The Debtor alleges that Rapid is an affiliate and representative of SBFS, authorized to act on its behalf, and that, on January 17, 2023, the Debtor and the "Creditors" entered into an agreement to restructure the Debtor's repayment of the existing loan debt to SBFS. According to the Debtor, the "Creditors" agreed to release the UCC lien on the Debtor's property upon receipt of the first of four monthly installment payments of $15,754.78. Attached to the Fourth Amended Complaint is a copy of the purported agreement, consisting of a letter signed by a representative of Rapid and addressed to Albert Pelate stating that "we" agree to settle "your" account for four monthly payments of $15,574.78 beginning January 17, 2023. The letter goes on to emphasize that "[t]he funds are due in our office no later than January 17, 2023[,]" and states that "when your wire is received and clears the account, we will release the UCC-1 filing[.]" The letter also directs that payment be made to SBFS, providing the address and account information for the payment.

According to the Debtor, the "Creditors" were aware of the Walgreens deal and the circumstances under which the Debtor sought a release of the SBFS lien. The Debtor alleges that it made the "Creditors" aware that "their [lien] was the last and only lien for which [the Debtor] had not yet reached an agreement for a release" and that the Walgreens deal would collapse without the release. Nevertheless, when the Pelates, on behalf of the Debtor, caused a wire transfer from their personal bank account to be made for the first $15,574.78 payment,

the "Creditors" apparently failed and refused to release the UCC lien contrary to their representations and in breach of the purported settlement agreement. Attached to the Fourth Amended Complaint is a copy of an email exchange between representatives of the Debtor, Rapid, and Walgreens regarding the lien release wherein Rapid stated that it required full payment of the debt before the lien would be released. The Debtor alleges that the Walgreens deal fell through as a result of the lien not being released. Without the sale proceeds to pay off its creditors, the Debtor filed its bankruptcy two weeks later.

The Fourth Amended Complaint consists of eight counts: breach of contract against both Defendants (Count I), equitable subordination under §510 against SBFS (Count II), tortious interference with a business expectancy against both Defendants (Count III), tortious interference with a contractual relationship against both Defendants (Count IV), negligent interference with a business expectancy against both Defendants (Count V), fraudulent inducement against both Defendants (Count VI), negligent misrepresentation against both Defendants (Count VII), and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act against both Defendants (Count VIII). Specifically, Count I alleges that the Debtor and "Creditors" entered into an agreement to settle the Debtor's account for a reduced amount of $63,019.15 and release of the UCC lien upon payment of the first of four installment payments of $15,754.78, that the "Creditors" breached the agreement by failing and refusing to release the lien after the Pelates satisfied the Debtor's payment obligation despite knowing that the Walgreens deal depended on the lien release,

and that the Walgreens deal in fact fell apart as a result. The Debtor alleges that it suffered damages for the lost value of the Walgreens contract. Count II alleges that SBFS acted inequitably in refusing to release its lien after the Pelates paid it $15,754.78 that SBFS was not entitled to but for its agreement to release the lien, which, in turn, resulted in injury to other creditors.

Count III alleges that the Debtor had a valid business expectancy in the Walgreens deal and that the "Creditors" knowingly and without justification intentionally interfered with that expectancy by "maliciously and intentionally refusing to release the [lien], which they were obligated to release" and/or "misrepresenting their intention to release" the lien. Count IV similarly alleges that the "Creditors," by the same conduct, knowingly and without justification interfered with the valid contract between the Debtor and Walgreens and that the actions of the "Creditors" caused Walgreens to terminate the contract with the Debtor. Counts III and IV both allege that the interference directly and proximately caused damage to the Debtor in an amount not less than the lost value of the Walgreens contract.

Count V alleges that the "Creditors" had knowledge of the Debtor's business expectancy from the Walgreens contract and "had a duty to communicate accurate information during the course of their negotiations." Count V further alleges that the "Creditor's [sic] breached its duty" in "careless[ly] and negligently refusing to release [the lien] upon the payment of the first installment of $15,754.78[,] carelessly and negligently misrepresent[ing] that the [lien] would be released upon payment of the first installment of $15,754.78[,]

and/or carelessly and negligently misrepresent[ing] the authority to release [the lien] upon the payment of the first installment of $15,754.78." The Debtor alleges that the negligent conduct prevented it from realizing its business expectancy and directly and proximately caused damage to the Debtor for the lost value of the Walgreens contract.

Count VI alleges that "[w]hen negotiating the January 17, 2023 Agreement, Creditors represented they would release the [lien] against Debtor after receiving the first payment of $15,754.78. See Exhibit B." Exhibit B, attached to the Fourth Amended Complaint consists of the January 17 letter representing the purported settlement agreement. Count VI then alleges that "Creditor's [sic] representation that they would release" the lien was a material fact and "was intended to induce [the Debtor] to act and cause to be made the first payment." The Debtor claims to have "justifiably relied upon the Creditor's [sic] representation and its shareholders, Albert and Cheryl Pelate, caused to be wired, on behalf of [the Debtor], $15,754.78 from their personal bank account to Creditors on January 17, 2023." Despite the payment being made, the "Creditors" failed and refused to release the lien, and the Debtor claims it was damaged for the lost value of the Walgreens contract.

Count VII is based on many of the same allegations as Count VI, namely the Debtor's reliance on representations of material fact by the "Creditors" regarding the lien release. Count VII also alleges that the "Creditors" had a duty to communicate accurate information during their negotiations with the Debtor and that "Creditor's [sic] breached its duty" by "careless[ly] and negligently

refusing to release [the lien] upon the payment of the first installment of $15,754.78[,] carelessly and negligently misrepresent[ing] that the [lien] would be released upon the payment of the first installment of $15,754.78[,] and/or carelessly and negligently misrepresent[ing] the authority to release [the lien] upon the payment of the first installment of $15,754.78." The Debtor alleges that the negligent conduct of the "Creditors" directly and proximately caused damage to the Debtor for the lost value of the Walgreens contract.

Finally, Count VIII alleges that the Debtor was a consumer as defined by the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), that the "Creditors" were engaged in the trade and practice of lending money to "the market in general" which implicates consumer protection concerns, and that the Debtor obtained financing as customer of the "Creditors." The Debtor asserts that, during negotiations to settle the loan debt, the "Creditors" represented they would release the lien with the intent to induce the Debtor's reliance and payment of $15,754.78. Count VIII claims the "Creditors" violated the ICFA by "engag[ing] in deceptive conduct" through misrepresentation as to the release of the lien upon payment, "fraudulently" or "carelessly and negligently" misrepresenting they would release the lien, "falsely promis[ing]" they would release the lien, "conceal[ing] and suppress[ing] the fact that Creditors did not intend to release" the lien, and/or "violat[ing] §2F of the ICFA." According to the Debtor, it was damaged for the lost value of the Walgreens contract as a direct and proximate result of those violations.

The Defendants' Motion to Dismiss seeks dismissal with prejudice of the Fourth Amended Complaint for failure to state claims upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), applicable here through Bankruptcy Rule 7012(b).[2] The Motion to Dismiss asserts that all counts should be dismissed as to Rapid because the allegations of the Fourth Amended Complaint only support a finding that Rapid is an agent of SBFS; Rapid was not a party to the original contract between the Debtor and SBFS, Rapid did not file and therefore had no authority to release the UCC lien, Rapid was not the recipient of the transfer at issue, and Rapid did not file a proof of claim in the Debtor's bankruptcy case. The Motion to Dismiss also makes several additional arguments for the dismissal of each count.

As to Count I, the Defendants contend that the allegations of the Fourth Amended Complaint are contradicted by the documentary exhibits attached to it and that the Debtor's interpretation of the parties' agreement is simply not plausible. As to Count II against SBFS, the Defendant argues that equitable subordination is precluded by the admitted fact that the payment was made by the Pelates from their personal bank account and that Count II sets forth no other allegations to plausibly suggest harm to the Debtor's creditors. The Defendants argue that Counts III and IV also fail as a matter of law because they do not allege any conduct directed at Walgreens, the third party dealing with the Debtor. The Defendants also contend that Count IV requires a breach of contract

---

[2] The Defendants also filed a Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Fourth Amended Complaint. For purposes of this Opinion, the Defendants' Motion to Dismiss and the supporting memorandum are treated as one and the same and may be referred to simply as the Motion to Dismiss.

by Walgreens and that the allegations do not support an inference of such breach.

As to Count V, the Motion to Dismiss asserts that negligent interference claims are not recognized under Maryland or Illinois law. The Defendants contend that Count VI sounds in fraud and is subject to a heightened pleading standard which the allegations fail to meet. Specifically, the allegations do not distinguish between SBFS and Rapid and only generally allege that "Creditors" made representations in negotiating the agreement. The Motion to Dismiss also argues that the payment having been made by the Pelates contradicts the Debtor's generic allegations of reliance and injury. The Defendants attack Count VII as being barred by the economic loss doctrine and Count VIII as being precluded by the Maryland choice-of-law provision in the original contract.

In its response to the Motion to Dismiss, the Debtor contends that the Defendants are trying to relitigate issues that the Court already decided in its earlier Opinion on dismissal of the second amended complaint. It also argues that the Maryland choice-of-law provisions of the original loan contract are not applicable to its claims against the Defendants because the January 2023 letter represents a substituted contract that does not incorporate the provisions of the original contract and contains no choice-of-law provisions of its own. Based on that, and its assertion that the new contract was entered into in the State of Illinois, the Debtor argues that its claims are governed by Illinois law.

As to Count I, the Debtor urges the Court to find a breach of contract claim has been plausibly stated against both Defendants based on its prior ruling

denying dismissal of the same claim in the second amended complaint. Similarly, the Debtor contends it has stated an equitable subordination claim against SBFS in Count II based on the Court having previously ruled that a claim was plausibly stated in the second amended complaint. The Debtor's response argues that Counts III and IV satisfy pleading standards because they allege conduct by the Defendants that caused the Walgreens deal to collapse. As to Count V, however, the Debtor concedes that negligent interference is not recognized as a separate cause of action under Illinois law.

The Debtor's response contends that the allegations of Count VI include enough specifics to advise the Defendants of the circumstances of alleged fraud and therefore meet the heightened pleading standard of Rule 9(b). The Debtor further argues that Count VII states a plausible claim for negligent misrepresentation because it is pleaded with the same specificity as Count VI but is not subject to the same heightened standard. Finally, as to Count VIII, the Debtor argues that the Defendants' conduct is subject to the ICFA and that the heightened pleading standard of Rule 9(b) does not apply to its claims under the statute because fraud is not necessarily a required element.

The Defendants filed a reply reiterating their arguments for dismissal and criticizing the adequacy of the Debtor's response to those arguments. The reply takes issue with the Debtor's new characterization of the January 2023 letter as a substituted agreement after two years and repeated references to the letter as an amended agreement in this litigation. The reply also focuses on certain discretionary language in the Walgreens contract and the intervening fact that

the Pelates made the payment around which the allegations of the Fourth Amended Complaint are centered, something they say prevents the Debtor from being able to establish the necessary elements for its claims.

The Court has reviewed and considered the parties' arguments along with the entire case record, and the matter is ready for decision.

## II.    Jurisdiction

This Court has jurisdiction over proceedings "arising under title 11, or arising in or related to cases under title 11" pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Southern District of Illinois have been referred to the bankruptcy judges. SDIL-LR Br1001.1; *see* 28 U.S.C. §157(a). Matters concerning the administration of the estate, counterclaims by the estate against persons filing claims against the estate, and other proceedings affecting the liquidation of assets of the estate or the adjustment of the debtor-creditor relationship are core proceedings. 28 U.S.C. §157(b)(2)(A), (C), (O).

Seven of the eight counts in the Fourth Amended Complaint, however, do not arise exclusively under the Bankruptcy Code and do not strictly arise in a bankruptcy case, and this Court is therefore exercising "related to" jurisdiction in this proceeding. The Court previously discussed its exercise of related to jurisdiction and whether there was a constitutional impediment to entry of a final judgment. *ACJK,* 2024 WL 4047140, at *4-5 (citing *Exec. Benefits Ins. Agency v. Arkinson*, 573 U.S. 25, 37-38 (2014), *Stern v. Marshall*, 564 U.S. 462, 493 (2011), 28 U.S.C. §157(c)). Impediments to entry of a final judgment may be

overcome by the knowing and voluntary consent of the parties to final adjudication by a bankruptcy judge. *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015). Consent may be implied, requiring only that "the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case" before the bankruptcy judge. *Jordan v. Pritchard (In re Pritchard)*, 633 B.R. 314, 325 (Bankr. E.D. Tenn. 2021) (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)).

Notwithstanding the Court's lengthy discussion of the issue in its September 2024 Opinion, the Fourth Amended Complaint, like every previous iteration, fails to affirmatively state that the Debtor consents to entry of a final judgment by this Court. Although, in dismissing parts of the second amended complaint without prejudice, the Court ultimately concluded that the absence of affirmative consent did not preclude entry of a non-final order, the Opinion outlined the issues surrounding consent and explained why the parties' conduct in pursuing and defending the litigation here led the Court to believe that they consented to entry of final orders. The Court explained that there was "little question that the Debtor, in commencing this adversary proceeding and seeking relief from the bankruptcy court, consents to this Court's jurisdiction." *ACJK*, 2024 WL 4047140, at *4. Whatever question remained has now been answered. Both parties were "made aware of the need for consent and the right to refuse it," and proceeded in silence; they have impliedly consented to entry of final orders by this Court. *See Pritchard*, 633 B.R. at 325 (citation omitted).

### III.    Legal Analysis

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, a complaint need only allege enough factual allegations to plausibly suggest a claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012. That is, a complaint must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 555); *see also* Fed. R. Civ. P. 8(a); Fed. R. Bankr. P. 7008. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). *Twombly* "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). While detailed specifics may not be required, there must be some facts alleged to support each element of the cause of action. *Iqbal*, 556 U.S. at 678-79; *see also Olson v. Champaign Cnty.*, 784 F.3d 1093, 1098-99 (7th Cir. 2015).

"A claim has facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). When ruling on a motion to dismiss, a court must accept all well-pleaded factual allegations as true and draw

all reasonable inferences in favor of the non-moving party. *Iqbal*, 556 U.S. at 678; *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012). Those well-pleaded facts, however, must "permit the court to infer more than the mere possibility of misconduct[.]" *Iqbal,* 556 U.S. at 679.

## A.  Applicable State Law

A preliminary issue raised by the Defendants is the laws that govern the Debtor's non-bankruptcy causes of action. The Defendants argue that Maryland law governs based on the choice-of-law provisions in the original contract between the Debtor and SBFS. The Debtor argues that the January 2023 letter at the heart of this litigation is a substituted contract containing no choice-of-law provision and that Illinois law therefore governs the non-bankruptcy claims.

The original contract between the Debtor and SBFS dated May 25, 2022, contained detailed provisions stating that Maryland law would govern the relationship of the parties. The contract also contained provisions providing that any changes or amendments to the original terms "shall not be effective unless they are in writing, agreed to by both Parties, and signed by Borrower and/or Gaurantor(s) as applicable" and that the choice-of-law provisions "shall survive any termination, satisfaction or cancellation of this Agreement." These provisions notwithstanding, the Debtor contends that the January 2023 letter signed by a representative of Rapid, apparently on behalf of SBFS, and addressed to Albert Pelate was a substitute contract between the Debtor and the Defendants that

replaced the original agreement between the Debtor and SBFS, effectively removing the Maryland choice-of-law provisions from application.

The Debtor cites §279 of the Restatement (Second) of Contracts, which Illinois courts have looked to in defining a substituted contract. *See McLean Cnty. Bank v. Brokaw,* 119 Ill. 2d 405, 415, 519 N.E.2d 453 (1988). The Restatement provides:

> (1) a substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.
>
> (2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty.

RESTATEMENT (SECOND) OF CONTRACTS §279 (1981). The comments to the Restatement further provide:

> *a.    Nature and effect of a substituted contract.* A substituted contract is one that is itself accepted by the obligee in satisfaction of the original duty and thereby discharges it. A common type of substituted contract is one that contains a term that is inconsistent with a term of an earlier contract between the parties. If the parties intend the new contract to replace all of the provisions of the earlier contract, the contract is a substituted contract. If a substituted contract brings in a new party it is called a "novation" (§280).

RESTATEMENT (SECOND) OF CONTRACTS §279 cmt. a. Although the comment to the Restatement draws a distinction between a substituted contract that changes the terms of an agreement and a substituted contract that changes the parties to an agreement, referring to the latter as a novation, the two are the same for practical purposes and effect under either Illinois or Maryland law. *Printing Mach. Maint., Inc. v. Carton Prods. Co.,* 15 Ill. App. 2d 543, 552, 147 N.E.2d 443

(1st Dist. 1957) ("All novations are substituted contracts; and the converse is also true that all substituted contracts are novations, though the term 'novation' is usually used only where the substituted contract involves a substituted debtor or creditor as a new party.") *Accord Hudson v. Maryland State Hous. Co.*, 207 Md. 320, 326, 114 A.2d 421 (Ct. App. 1955) (noting use of the term "novation" by Maryland courts to describe both a new contract with new parties and a substituted contract between the same parties). Thus, the required elements for "novation"—which are essentially the same under Illinois and Maryland law— apply to substituted contracts involving one or more new parties as well as substituted contracts involving the same parties.

A novation has four required elements: (1) a previous, valid obligation, (2) the agreement of all parties to a new contract, (3) validity of the new contract, and (4) extinguishment of the old contract by substitution of the new contract. *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 887 (7th Cir. 2005) (citations omitted); *Byrd v. Roostertail, Inc.,* 2025 WL 1442720, at *6 (App. Ct. Md. May 20, 2025) (citations omitted). It is a well settled principle that novation is not presumed; it must be evident from the four corners of the contract in question— together with the surrounding circumstances if the contract is ambiguous—that the parties intended to extinguish and replace the old contract, and all its terms, with the new contract. *Nat'l Surety Corp. v. K&C Framing, Inc.,* 2018 WL 1830960, at *8 (Ct. Spec. App. Md. Apr. 17, 2018) (citations omitted); *Astra Capital, LLC v. BCI Aircraft Leasing, Inc.,* 2019 WL 2248526, at *3 (N.D. Ill. May 24, 2019) (citations omitted).

Here, the January 2023 letter is silent as to the parties' intent to extinguish the original contract between the Debtor and SBFS. Indeed, neither the Debtor nor the original contract is even mentioned. The letter merely expresses SBFS's apparent agreement to settle an account debt and release its lien for a lesser amount. It is not evident from the four corners of the document that it was intended to be a novation that extinguished the original agreement. Nothing in the other exhibits attached to the Fourth Amended Complaint suggests otherwise. To the contrary, the alleged subsequent email sent by Rapid clarifying its understanding that the lien would not be released until the settlement amount was paid in full suggests an intent not to alter the Defendants' position before the Debtor fully performed its obligations under the settlement. In addition, the email notes that "[t]he Stipulation Agreement is still being created[,]" suggesting that the parties' agreement had yet to be finalized and that the January 2023 letter may not have memorialized the parties' complete agreement.

Compounding matters, the original agreement expressly required that any changes or amendments to the original terms be in writing, agreed to by all parties, "and signed by Borrower and/or Guarantor(s) as applicable" to be effective, and the January 2023 letter is signed only by a representative of Rapid and addressed to the Debtor's principal. The original contract also provided that the choice-of-law provisions "shall survive any termination, satisfaction or cancellation" of the contract. It would be inappropriate to ignore the express

terms of the original contract while reading contrary language into the January 2023 letter absent clear intent of the parties.

Further, in the nearly two years this litigation has been pending, the Debtor had not previously asserted or even suggested that the January 2023 letter was an agreement intended by the parties to extinguish the original contract. Rather, through the first four iterations of its complaint, the Debtor described the January 2023 letter as an "amended agreement" that restructured the terms of payment. The Debtor now contends that the letter was a substituted agreement to avoid application of the Maryland choice-of-law provisions in the original contract despite failing to respond to the issue when raised in the Defendants' motion to dismiss the second amended complaint.

While the Court must accept all well-pleaded facts as true and draw reasonable inferences in the light most favorable to the Debtor, that does not require the Court accept the Debtor's characterization of the January 2023 letter as a substituted agreement that extinguished the original contract between SBFS and the Debtor. *See Bonte v. U.S. Bank,* 624 F.3d 461, 465 (7th Cir. 2010) (court "not bound to accept as true a legal conclusion couched as a factual allegation") (citations omitted). No facts are alleged that would support the Debtor's bald assertion, and nothing in the documents attached to the Fourth Amended Complaint permit the Court to draw the inference. For purposes of resolving the Motion to Dismiss, the Court finds that the January 2023 letter did not extinguish the original contract between the Debtor and SBFS or the choice-

of-law provisions therein. The question is then whether and to what extent the choice-of-law provisions will be given effect.

Illinois follows the Restatement (Second) of Conflicts of Laws in evaluating and deciding choice-of-law issues. *Morris B. Chapman & Assocs. v. Kitzman,* 193 Ill. 2d 560, 568-69, 739 N.E.2d 1263 (2000). And where, as here, parties have included a choice-of-law provision in their contract, §187 of the Restatement applies. *Hall v. Sprint Spectrum L.P.,* 376 Ill. App. 3d 822, 825-26, 876 N.E.2d 1036 (5th Dist. 2007). The Restatement provides in relevant part:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>>
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of §188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS §187 (1971).

Count II seeking equitable subordination of SBFS's claim in the bankruptcy case is the only bankruptcy cause of action in the Fourth Amended

Complaint and it is governed by federal law. The remaining causes of action asserted in the Fourth Amended Complaint are based on state law. Count I is a common law breach of contract claim, and Counts III through VII are common law tort claims. Count VIII asserts claims for statutory violations under the ICFA.

The common law contract and tort claims fall within subsection (1) of the Restatement. The original contract explicitly provides that Maryland law would govern the parties' relationship, including claims based in tort or contract. Illinois courts will apply a contract's choice of law clause to disputes arising from the contract, so long as the contract is valid. *Medline Indus. Inc. v. Maersk Med. Ltd.,* 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002). Maryland recognizes contracting parties' right and ability to agree as to the law which will govern their transaction, even issues going to the validity of the contract. *Rock Spring Plaza II, Inc. v. Investors Warranty of Am., LLC*, 618 F. Supp. 3d 262, 268 (D. Md. 2022). Further, in Illinois, choice-of-law provisions are construed to govern tort claims if that is what the parties intended, and, in any event, "tort claims that are dependent upon the contract are subject to a contract's choice-of-law clause regardless of the breadth of the clause." *Medline Indus.,* 230 F. Supp. 2d at 862 (citing *Kuehn v. Childrens Hosp., Los Angeles,* 119 F.3d 1296, 1302 (7th Cir. 1997), and *Precision Screen Machs. Inc. v. Elexon, Inc.,* 1996 WL 495564, at *2-3 (N.D. Ill. Aug. 28, 1996)). Maryland also permits parties to agree on the law which will govern contract-related tort claims through choice-of-law contract provisions. *FTI Consulting, Inc. v. Orszag,* 2025 WL 2085761, at *6-7 (D. Md. July 24, 2025) (citations omitted). Each of the common law tort claims asserted in the Fourth

Amended Complaint relate to the parties' contractual relationship. The parties therefore could and did resolve to have Maryland law govern their disputes arising from contract and tort, and Maryland law should be applied to the Debtor's common law contract and tort claims in Counts I, III, IV, V, VI, and VII.

The choice-of-law provisions in the original contract also expressly provide for Maryland law to govern claims of the parties that arise under statute, and Count VIII is based on violations of Illinois consumer fraud statute. The application of choice-of-law provisions to claims under the ICFA has been considered by an Illinois appellate court, albeit in the context of class action litigation. *Hall,* 376 Ill. App. 3d at 823. In *Hall*, the court found that the parties' agreement expressly contemplated that Kansas law would govern their agreement and related disputes. Finding no public policy against applying a foreign state's consumer protection laws or that Illinois had a materially greater interest in the litigation, the court upheld the choice-of-law provision to apply Kansas law, including its consumer protection laws, even though application of the ICFA might otherwise be appropriate. *Id.* at 825-829. Thus, Illinois policy and interests do not preclude application of the parties' choice of Maryland law to govern statutory consumer fraud claims here.

*Hall* was decided through analysis of subsection (2) of the Restatement, which bars application of the parties' choice if the "chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice[.]" RESTATEMENT (SECOND) OF CONFLICTS OF LAWS §187(2)(a). Here there is clearly a connection to Maryland; the contract

recognizes that the choice of governing law is based on Maryland being SBFS's principal place of business. That has been recognized as a reasonable basis for the chosen law. *Hall*, 376 Ill. App. 3d at 826.

As agreed by the Debtor and SBFS in the contract dated May 25, 2022, Maryland law governs the Debtor's nonbankruptcy causes of action in the Fourth Amended Complaint. The Court therefore will evaluate whether Counts I, III, IV, V, VI, VII, and VIII state claims upon which relief may granted under Maryland law.

### *B. Count I: Breach of Contract*

In Maryland, a breach of contract claim requires allegations of (1) a contract and obligation, (2) breach by the defendant, and (3) resulting damages to the plaintiff. *SG Maryland, LLC v. PMIG 1024, LLC*, 264 Md. App. 245, 260, 329 A.3d 373 (App. Ct. 2024); *Kantsevoy v. LumenR, LLC,* 301 F. Supp. 3d 577, 596 (D. Md. 2018) (citations omitted). Here, the Fourth Amended Complaint alleges that, on January 17, 2023, the parties entered into an agreement providing for the release of the UCC lien filed by SBFS in accordance with the original loan agreement in exchange for the first of four accelerated installment payments for a reduced total in settlement of the existing debt owed by the Debtor. The Fourth Amended Complaint also alleges that the Pelates, on behalf of the Debtor, performed the obligation to pay the first installment and that the Defendants breached their obligation triggered by the payment when they failed or refused to release the lien upon receipt. Finally, the Fourth Amended

Complaint alleges that, as a direct and proximate result of the Defendants'
breach, the Debtor suffered damages, including but not limited to the lost value
of the Walgreens deal.

The Motion to Dismiss the Fourth Amended Complaint renews many of
the same arguments made in its earlier motion to dismiss the second amended
complaint: Rapid was not a party to any contract and cannot be liable as agent
of SBFS, the allegations of the Fourth Amended Complaint lack specificity and
are betrayed by the exhibits attached thereto, and it is not plausible that one or
both Defendants would agree to release the lien prior to full payment. Each
argument will be addressed in turn.

The Defendants are correct that, absent their agreement to the contrary,
agents are generally not liable for acts done on behalf of their principal. Count I
does not allege that Rapid agreed to be personally liable; it merely asserts, in
conclusory fashion, that "Creditors" entered into an agreement to settle the
Debtor's account. The Court previously explained that the Debtor's attempt to
rope both Defendants into its breach of contract action without alleging facts to
support a claim against Rapid was problematic and would likely fail to state a
claim against Rapid under ordinary circumstances. *ACJK,* 2024 WL 4047140, at
*6. It is certainly disappointing that, rather than give meaningful consideration
to whether it has a breach of contract claim against Rapid and accordingly drop
or bolster its claims against Rapid, the Debtor simply recycled the breach of
contract allegations from the second amended complaint. But, as the Defendants
are aware, the Debtor's breach of contract count in the second amended

complaint survived against each of them based on their prior admissions in their answer to the original complaint that they were both parties to the settlement agreement with the Debtor. *Id.* The Court explained at the time that the Defendants' admission was enough to push the claim from the realm of possibility to that of plausibility. *Id.* at *7. The allegations of breach of contract in the Fourth Amended Complaint—at least as they relate to the Defendants prior admissions—have not materially changed. As such, the Defendants continue to be bound by their prior admissions for purposes of dismissal but also remain free to deny the allegations in any answer they file.

The Defendants' arguments that Count I should be dismissed entirely because the allegations are contradicted by the documents attached to the complaint and inconceivable in the context of the circumstances alleged were also addressed by the Court in its earlier decision. As the Court previously explained, the arguments "merely represent one side's subjective version of facts that are clearly in dispute." *Id.* at *6. Attached to the Fourth Amended Complaint as exhibits are many of the same documents included with prior iterations of the complaint. Among them is the January 17, 2023, email from Rapid clarifying that the lien would not be released before full payment, which the Defendants continue to maintain highlights the absurdity of the Debtor's assertions to the contrary. The Defendants also point to some newly-included exhibits—namely a series of emails between the parties in the days leading up to January 17, 2023— which they say also contradict the allegations of the Fourth Amended Complaint. But none of the emails conclusively establish the absence of agreement by one

or both of the Defendants to release the lien upon payment of the first installment of $15,754.78; nor do the emails render the Debtor's allegations about the purported agreement implausible. As the Court said in its earlier Opinion, it will not speculate as to why a party would or would not have acted in one manner or another and the Debtor is entitled to have reasonable inferences drawn in its favor at the pleading stage. *Id.* The communications represent nothing more than the apparent positions of the parties during the period surrounding the alleged settlement agreement and create a factual dispute properly reserved for a later date.

The same goes for the Defendants' argument that it is implausible that they could be liable for the collapse of the Walgreens deal because Walgreens had the option to close the deal despite unreleased liens and because the bankruptcy case record reflects that no other creditors released their liens. These assertions certainly raise questions about causation and damages, but they no more refute than establish the Defendants' liability. These are questions of proof that are premature at this stage.

The Defendants also contend that, at minimum, the Debtor should be required to plead with greater particularity the timing of events on January 17, 2023, because it is key not only to the breach of contract claim but the other claims involving fraud and would make the difference between a modest amount and a potentially astronomical amount of damages. The Court agrees that the precise timing of events will be critical to resolving the parties' dispute, but the Debtor is not required to supply evidence at the pleading stage and the plain

inference drawn from the allegations is that the funds were sent before Rapid sent its clarifying email. Whether the allegations are enough for the Debtor's fraud claims to survive dismissal will be discussed below. But for purposes of stating a plausible claim for breach of contract, Count I will survive dismissal.

### C. Count II: Equitable Subordination

Count II seeks equitable subordination under §510(c) of "any potential distribution to or lien of SBFS[.]" 11 U.S.C. §510(c). Equitable subordination is generally comprised of three elements: (1) the claimant "engaged in some type of inequitable conduct"; (2) the misconduct "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant"; and (3) "subordination must not be inconsistent with the provisions of the Bankruptcy Act." *In re Kreisler,* 546 F.3d 863, 866 (7th Cir. 2008) (citations omitted) (internal quotation marks omitted). To that end, the Debtor merely incorporates all prior allegations of the complaint and asserts that "SBFS [sic] conduct in refusing to release the UCC-1 filing as described above was inequitable conduct." Count II further alleges that the "result of SBFS [sic] inequitable conduct resulted in Albert and Cheryl Pelate to cause to be wired, on behalf of [the Debtor], $15,754.78 to SBFS that SBFS was not otherwise entitled to receive" and that the payment "resulted in injury to other creditors."

In arguing for dismissal of Count II, SBFS says that the payment at issue, even if on behalf of the Debtor, was made from the Pelates' account which in effect reduced the Debtor's outstanding debts without depleting the assets of the

Debtor's bankruptcy estate available to pay other creditors. SBFS contends that Count II fails to state a claim because the Debtor cannot establish, under the facts alleged, that its creditors were injured by the Pelates using their personal funds to pay down the debt owed to SBFS. The Debtor counters that the issue was already addressed by the Court when it denied dismissal of the equitable subordination count against SBFS in the second amended complaint and that the payment being made by the Pelates does not negate Count II because equitable subordination focuses on the conduct of the defendant.

The Court agrees with SBFS. The equitable subordination count now before the Court differs from that asserted in the second amended complaint in a material way. Previously, the claim was based on allegations that the Debtor paid SBFS with funds that presumably would have been available for distribution among all creditors thereby causing harm to the other creditors. But Count II of the Fourth Amended Complaint acknowledges the intervening fact that the funds were paid from the Pelates' personal account, reducing the debt owed to SBFS without diminishing funds of the Debtor's bankruptcy estate and thereby allowing for a larger dividend to the creditor body as a whole. In *Kreisler*, the court determined that inequitable conduct alone did not justify subordination, stating that "[o]nly misconduct that harms other creditors will suffice, and there is no evidence that [the debtors' scheme to purchase a bank's claims] harmed any of their creditors." *Kreisler*, 546 F.3d at 866-67. In the context of the circumstances alleged, the Debtor's unadorned assertion that

SBFS's conduct resulted in injury to the creditor body does not permit the Court to reasonably infer even the possibility of liability. *Iqbal*, 556 U.S. at 678-79.

Although not directly alleged, Count II also suggests that the inequitable conduct conferred an unfair advantage on SBFS in that the payment from the Pelates allowed SBFS to receive more than it would otherwise be entitled to receive. But, like the unadorned allegation of harm, the allegation that SBFS received more than it would otherwise be entitled does not on its own support a reasonable inference of liability. *Id.* Assuming SBFS took unfair advantage, it would still be inappropriate to allow Count II to proceed in the absence of allegations as to how other creditors were affected because the focus of equitable subordination is on remediating harm or unfairness to the other creditors rather than punishing the bad actor. *Kreisler,* 546 F.3d at 866 ("Equitable subordination is remedial, not punitive, and is meant to minimize the effect that the misconduct has on other creditors.") S*ee also ALT Hotel, LLC v. DiamondRock Allerton Owner, LLC (In re ALT Hotel, LLC),* 479 B.R. 781, 804-05 (Bankr. N.D. Ill. 2012) (count dismissed for failure to allege harm to creditors), *Friedmeyer v. Breath of Life 02, LLC (In re Breath of Life Home Med. Equip. & Respiratory Servs., Inc.),* 2017 WL 1058261, at *7 (Bankr. S.D. Ind. Mar. 20, 2017) ("The focus of §510(c) is less about punishing the specific creditor and more about remediating the unfairness to other creditors that results from *that creditor's claim position.*")

In previously ruling that the second amended complaint stated a claim for equitable subordination against SBFS, the Count noted that the claim as then pleaded left much to be desired. The Debtor declined the opportunity to bolster

its claim in the Fourth Amended Complaint, even though confronted with a material change in the facts. It did so to its detriment. The change in fact altered the analysis of whether the Debtor stated a plausible claim for relief. The Court cannot draw a reasonable inference of harm from the bare-bone allegations of Count II of the Fourth Amended Complaint. Count II therefore fails to state a facially plausible claim for equitable subordination and will be dismissed.

*D. Count III: Tortious Interference with Business Expectancy*

Count III seeks relief against both Defendants for tortious interference with a business expectancy. As discussed, Count III is a common law tort claim governed by Maryland law. Maryland law recognizes claims for tortious interference with business relations with the following elements: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damages and loss resulting." *Spengler v. Sears, Roebuck & Co.,* 163 Md. App. 220, 242, 878 A.2d 628 (Ct. Spec. App. 2005) (citations omitted).

The Fourth Amended Complaint alleges the Defendants intentionally interfered with the Debtor's business expectancy in two ways: (1) by "maliciously and intentionally refusing to release the [lien], which they were obligated to release; and/or" (2) by "misrepresenting their intention to release" the lien. The Defendants contend that Count III fails because neither action constituting

interference is alleged to be directed at Walgreens. But Maryland law does not require that conduct be directed at the third party, only that the conduct be "directed at" an "existing or prospective economic relationship between the plaintiff and a third party." *Cambridge Title Co. v. Transamerica Title Ins. Co.,* 817 F. Supp. 1263, 1276 (D. Md. 1992) (citing *K&K Mgmt., Inc. v. Lee,* 316 Md. 137, 159, 557 A.2d 965 (Ct. App. 1989)). Importantly, deliberate intent to harm a business relationship is not enough on its own; the interference must also have been accomplished through improper means. *Spengler,* 163 Md. App. at 242-43; *see also Total Recon Auto Ctr., LLC v. Allstate Ins. Co.,* 705 F. Supp. 3d 510, 520 (D. Md. 2023) (proof of both a tortious intent and improper or wrongful conduct required).

Maryland courts have limited "improper means" or wrongful conduct to "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith[;]" those courts have "declined to recognize that there exists such a wrongful act when there is merely a breach of contract that has an incidental effect on the plaintiff's business relations with third parties." *Spengler*, 163 Md. App. at 243; *see also State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic*, 2021 WL 2949785, at *7 (D. Md. July 14, 2021) and *Elliott v. Maryland Corr. Training Ctr.,* 2021 WL 2155035, at *5-6 (D. Md. May 27, 2021) (both decisions dismissing claims based on inability to satisfy third element of cause of action). But a breach of a contract between plaintiff and defendant can be the basis for a tortious interference claim if the defendant

breached the contract for the purpose of interfering with business relations between the plaintiff and a third party. *K&K Mgmt.,* 316 Md. at 160-61. The example given in *K&K* was a circumstance where "the breach or threatened breach of the [plaintiff-defendant] contract may be the instrument selected by [the defendant] for the purpose of interfering with the [plaintiff-third party] contract." *Id.* (citing *Sumwalt Ice Co. v. Knickerbocker Ice Co.,* 114 Md. 403, 80 A. 48 (Ct. App. 1911)).

As to the Defendants' refusal to release the lien, even if malicious and intentional, the allegation does not fall within the categories of conduct recognized as improper but is instead the very conduct Maryland courts have refused to recognize (i.e. breach of contract). *See Serv. 1st Vending, Inc. v. Compass Group USA, Inc.,* 2021 WL 1312906, at *6 (D. Md. Apr. 8, 2021) (citations omitted). Further, even though the interference asserted here is centered around the Defendants' alleged breach of the contract with the Debtor, the Fourth Amended Complaint does not allege that the agreement was breached for the purpose of interfering with the Walgreens deal or even that the Defendants' actions were directed at the Debtor's economic relationship with Walgreens; it merely alleges that the Defendants' "intentional interference" was a proximate cause of the failed Walgreens deal. Maryland law requires both intentional action and wrongful purpose, and, as the Defendants point out, Count III sets forth no allegations as to the purpose of the Defendants' actions. *Volcjak v. Washington Cnty. Hosp. Ass'n,* 124 Md. App. 481, 512-14, 723 A.2d 463 (Ct. Spec. App. 1999) (absence of allegation of aggravation in the form

violence, intimidation, defamation, or fraud, or that defendant sought to appropriate business from third party contracting with plaintiff was fatal to claim).

As for the allegation of tortious interference by misrepresentation of intent to release the SBFS lien, it does sound in fraud and is therefore subject to the heightened pleading standard of Rule 9(b). *C&R Caulking, LLC v. Bank of Am.,* 2021 WL 2661875, at *6 (D. Md. June 29, 2021); *View Point Med. Sys., LLC v. Athena Health, Inc.,* 9 F. Supp. 3d 588, 610-11 (D. Md. 2014); *Medscript Pharmacy, LLC v. My Script, LLC,* 77 F. Supp. 3d 788, 793-94 (N.D. Ill. 2015). Count III does not specify which of the Defendants made misrepresentations, which of the Defendants refused to release the lien, or whether the alleged misrepresentations are based solely on the purported settlement agreement or some other conduct. As discussed, lumping both Defendants into the category of "Creditors" is not helpful; "[i]n a multiple-defendant action, the complaint should inform each defendant of the nature of his or her alleged participation in the fraud." *PharMerica Chicago, Inc. v. Meisels,* 772 F. Supp. 2d 938, 955 (N.D. Ill. 2011) (citations omitted).

Count III alleges nothing more than a breach of contract paired with bald assertions of possible wrongdoing. To state a plausible claim for relief, the Debtor was required to plead "more than labels and conclusions" and enough facts to raise "that possibility above a speculative level[.]" *Twombly*, 550 U.S. at 555; *Concentra Health*, 496 F.3d at 776. The Debtor failed to meet that threshold, and Count III will therefore be dismissed as to both Defendants.

*E.  Count IV: Tortious Interference with Contractual Relationship*

Count IV seeks relief against both Defendants for tortious interference with a contractual relationship. Like Count III, Count IV is a common law tort claim governed by Maryland law. In Maryland, tortious interference with contract is a recognized cause of action with the following elements: (1) existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach of the contract by the third party; and (6) resulting damages to the plaintiff. *Brass Metal Prods., Inc. v. E-J Enters., Inc.,* 189 Md. App. 310, 348, 984 A.2d 361 (Ct. Spec. App. 2009); *see also Wilmington Trust Co. v. Clark,* 289 Md. 313, 329, 424 A.2d 744 (Ct. App. 1981).

Count IV alleges the Defendants intentionally interfered with the contract between the Debtor and Walgreens in two ways: (1) by "maliciously and intentionally refusing to release [the lien], which they were obligated to release;" and/or (2) by "misrepresenting their intention to release" the lien. The Defendants primarily contend that Count IV fails because it does not allege that the actions constituting interference induced Walgreens to breach its contract with the Debtor; at best, Walgreens chose not to proceed with the contract based on the unfulfilled contract provision requiring release of liens which the Defendants say would have happened if they had simply refused to negotiate settlement with the Debtor. The Defendants' argument misses the mark.

The prevailing line of authority suggests that "proof of breach of contract is not an essential element of the tort[;]" a right of action could also be asserted "against a third party who unjustifiably causes an existing contract to be terminated without breach." *Lake Shore Investors v. Rite Aid Corp.,* 67 Md. App. 743, 747-48, 753, 509 A.2d 727 (Ct. Spec. App. 1986) (purchaser canceled contract when seller was unable to obtain release of claim from third party) ("[W]e hold that a person who intentionally and wrongfully hinders contract performance, as by causing a party to cancel the contract, and thereby damages a party to the contract, is liable to the injured party even if there is no breach of the contract.") *See also Total Recon Auto,* 705 F. Supp. 3d at 517-18 (collecting cases). A competing line of authority, however, views breach of contract as the distinguishing characteristic between a claim for tortious interference with contract and a claim for tortious interference with business or economic relations—as asserted in Count III. *See Maryland Indus. Group, LLC v. Bluegrass Materials Co.,* 2018 WL 3006354, at *7 (Md. Ct. Spec. App. June 15, 2018). The Court is not inclined to dismiss Count IV based on the absence of a technical breach by Walgreens. The Debtor alleged that Walgreens terminated its contract with the Debtor, and that is sufficient for present purposes. But that is not the end of the inquiry.

Tortious interference with contract and tortious interference with economic or business relations have long been recognized as two branches of the same tort under Maryland law. *Lake Shore Investors,* 67 Md. App. at 751-53. Many of the requirements for tortious interference with business relations are

therefore also applicable to claims for tortious interference with contract, but defendants are afforded greater leeway in their interference when no contract or a contract terminable at will is involved. *Macklin v. Robert Logan Assocs.,* 334 Md. 287, 297-303, 639 A.2d 112 (Ct. App. 1994); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69-70, 485 A.2d 663 (Ct. App. 1984).

Like Count III, the alleged interference in Count IV is based on breach of contract between the Defendants and the Debtor. Although not impossible, a breach of contract between plaintiff and defendant generally does not support a claim for tortious interference with contract relations. *K&K Mgmt.,* 316 Md. at 160-63. Tortious interference based on breach by defendant of a contract between the defendant and plaintiff has been limited to circumstances where the defendant acted with the purpose of interfering with the plaintiff's contractual relations with a third party so that the defendant could obtain the benefit of the economic relationship with that third party. *Id.* But if the plaintiff's contract with the third party "is one terminable at will or at the option of the party importuned" then the defendant "does not improperly interfere with the contractual relation if no wrongful means are employed." *Macklin*, 334 Md. at 304-06 (citations omitted).

Count IV alleges the Defendants' actions "directly and proximately cause[d] Walgreens to terminate" the agreement, but, as in Count III, neither action is alleged to have been taken for the purpose of appropriating the Debtor's business opportunity with Walgreens for the Defendants' own benefit. Assuming the Walgreens contract was one not terminable at will, the absence of allegations

from which the Court can infer that the Defendants acted with the purpose of interfering with the Walgreens contract to obtain their own benefit from an economic relationship with Walgreens is fatal to Count IV.

But even if the Walgreens contract was terminable at will, Count IV fails for the same reasons Count III fails to state a claim. First, the allegation that the Defendants "refused to release the lien" is not accompanied by allegations of aggravating conduct recognized under Maryland law. Second, the allegation that the Defendants "misrepresented their intent" to release the lien is subject to the Rule 9(b) pleading standard yet fails to articulate which of the Defendants did what and when.

Because the Defendants' alleged breach of contract with the Debtor serves as the basis of the Debtor's tortious interference with contract claim, the appropriate remedy lies in contract rather than tort in the absence of allegations of motive or additional wrongful conduct to form an independent basis for tort action. Count IV fails to state a plausible claim for tortious interference with contract against either Defendant and will therefore be dismissed as to both Defendants.

### F. Count V: Negligent Interference with Business Expectancy

Count V seeks relief against both Defendants for negligent interference with a business expectancy. The Defendants contend that the relief requested in Count V is not available under Maryland or Illinois law. In its response, the Debtor concedes that negligent interference with business expectancy is not

recognized as a separate cause of action under Illinois law. The Debtor's response does not address the Defendants' argument that the cause of action is also not recognized under Maryland law.

The Defendants cite *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 2002 WL 32500569, at *6 (Cir. Ct. Md. Mar. 20, 2002), in which case the plaintiff conceded that Maryland does not recognize a cause of action for negligent interference with prospective economic advantage and the court accordingly dismissed that count. *Semtek* itself does not rely on any authority or engage in any discussion of the issue, but this Court's own research of Maryland law yielded no decisions to the contrary. Given the absence of authority recognizing negligent interference with business expectancy or the like under Maryland law and the Debtor's silence on the issue, the Court is inclined to agree with the Defendants. Count V will therefore be dismissed.

### G. Count VI: Fraudulent Inducement

Count VI seeks relief against both Defendants for fraudulent inducement, another common law tort claim rooted in contract and governed here by Maryland law. Under Maryland law, fraudulent inducement refers to "a situation where a person is induced by some fraudulent representation or pretense to execute the very instrument which is intended to be executed." *Swinton Home Care, LLC v. Tayman,* 264 Md. App. 487, 496, 330 A.3d 1189 (App. Ct. 2025) (citations omitted). The elements are as follows:

> (1) the defrauding party made a false representation to the party defrauded, (2) the falsity of the representation was either known

> to the defrauding party or the representation was made with
> reckless indifference to its truth, (3) the misrepresentation was
> made for the purpose of defrauding the party defrauded, (4) the
> party defrauded relied on the misrepresentation and had the right
> to rely on it, and (5) the party defrauded suffered compensable
> injury as a result of the misrepresentation.

*Id.* at 496 (citations omitted).

Count VI generally alleges that the Defendants, "when negotiating the January 17, 2023 Agreement," represented that they would release the lien against the Debtor in exchange for the first of four payments of $15,754.78 with the intention of inducing the Debtor to cause such payment to be made but then refused to release the lien upon receipt of the payment as agreed. The Defendants attack Count VI on three bases: (1) it is barred by the economic loss doctrine, (2) it does not comply with the heightened pleading standard of Rule 9(b), and (3) the Debtor did not make the payment allegedly induced.

The Defendants are correct that the economic loss doctrine generally bars tort actions for purely economic losses arising out of breach of contract for which liability is more appropriately determined by commercial law. *E.g., Cmty. Bank of Trenton v. Schnuck Markets, Inc.,* 887 F.3d 803, 812-13 (7th Cir. 2018); *Fidelis Cybersecurity, Inc. v. Partner One Capital, Inc.,* 771 F. Supp. 3d 614, 635-36 (D. Md. 2025). But in many jurisdictions, including Maryland, courts "have recognized that the economic loss rule does not bar claims of fraudulent inducement to contract." *Dwoskin v. Bank of America,* 850 F. Supp. 2d 557, 569 (D. Md. 2012) (citing *Marvin Lumber & Cedar Co. v. PPG Indus.,* 223 F.3d 873, 885 (8th Cir. 2000), and *Superior Bank v. Tandem Nat'l Mortg., Inc.,* 197 F. Supp.

2d 298, 311 & n.22 (D. Md. 2000)); *accord Cmty. Bank of Trenton*, 887 F.3d at 813 (recognizing exception to economic loss rule for fraud). The recognition of fraudulent inducement claims as an exception to the economic loss rule, however, is not without limits, and case law reflects an effort to strike a balance between protecting victims of fraud and maintaining a distinction between contract and tort actions.

On one hand, the "failure to fulfill a promise is merely a breach of contract" and "fraud cannot be predicated on statements which are merely promissory in nature, or upon expressions as to what will happen in the future." *View Point Med. Sys., LLC v. Athena Health, Inc.,* 9 F. Supp. 3d 588, 612 (D. Md. 2014) (quoting *Sass v. Andrew,* 152 Md. App. 406, 438, 832 A.2d 247 (Ct. Spec. App. 2003) (citations omitted) (internal quotation marks omitted)). On the other hand, a promisee generally has the right to assume that the promisor has an existing intention to fulfill their promise, and a promisor may commit fraud if they enter an agreement to do something without the present intention of performing. *First Union Nat'l Bank v. Steele Software Sys. Corp.,* 154 Md. App. 97, 134-35, 838 A.2d 404 (Ct. Spec. App. 2003). The justification for excepting fraudulent inducement claims from the economic loss rule has therefore been framed in terms of such claims being "necessarily prior to the contract" and "independent of the contract." *Dwoskin,* 850 F. Supp. 2d at 569.

Here, the alleged fraud is based on the unkept promise to release the lien. The Debtor generally alleges that the relevant representations were made "when negotiating" the settlement agreement, implying that they were made prior to

and independent of the contract. But whether the Debtor's allegations are enough to state a plausible claim must be determined through the lens of the applicable pleading standard.

In Maryland, fraudulent inducement falls within the umbrella of fraud and is subject to a heightened pleading standard. *Worden v. 3203 Farmington LLC,* 2023 WL 4945171, at *8-9 (App. Ct. Md. Aug. 3, 2023). "Plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Saas v. Major, Lindsey & Africa, LLC,* 2024 WL 2113654, at *6 (D. Md. May 10, 2024) (citations omitted) (internal quotation marks omitted). By simply alleging that, "when negotiating the January 17, 2023 Agreement, Creditors represented that they would release" the lien, the Debtor omitted several key facts of who did what, when, and how. The Defendants note that they are separate legal entities; yet Count VI, like the rest of the Fourth Amended Complaint, draws no distinction between the two and the allegations are made generically against "Creditors." It is not at all clear which Defendant made statements or to whom they were made and in what context. Further, despite alleging the statements were made "when negotiating the January 17, 2023 Agreement," the Debtor appears to be relying on the promise in the agreement itself, which is incorporated by reference and cited in support of the allegation. As mentioned above, the availability of a claim for fraudulent inducement presumes that it is independent of the contract. The lack of particularity as to

the maker, timing, content, and context of the representations made is insufficient to meet the heightened pleading standard of Rule 9(b).[3]

In the interest of completeness, brief discussion is warranted on the Defendants' argument that the Debtor cannot establish the reliance and causation elements of fraudulent inducement because the Pelates rather than the Debtor made the payment allegedly in reliance on the Defendants' promise. While the Defendants' argument has some appeal—Maryland courts widely frame the elements of a fraudulent inducement claim in terms of a plaintiff's action or inaction in reliance on a defendant's representations and the injury suffered by the plaintiff as a result—it is not clear that the circumstances here would preclude relief under Maryland law.

There are decisions that stand for the general proposition that the plaintiff's personal reliance is necessary for a fraud claim and that a third party's reliance to the plaintiff's detriment is not enough on its own. *E.g.*, *Wright v. Willow Lake Apartments (MD) Owner, LLC*, 648 F. Supp. 3d 647, 660 (D. Md. 2023) (relying on *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 336, 71 A.3d 30, 50 (Ct. App. 2013)). But those decisions generally involved fraudulent statements directed at and relied on by third parties not affiliated with the plaintiff who was incidentally harmed by the fraud but not otherwise a part of the transaction. The

---

[3] The Defendants also point to the absence of another important fact—the timing of the wire transfer relative to Rapid's email clarifying its understanding of the agreement. The Court agrees that the timing of events is critical, and it is concerning that with each amended complaint comes a material change in facts and new additional documents that undercut as much as support the Debtor's claims. But the Fourth Amended Complaint plainly alleges that the clarifying email was sent "after the wiring," all of which—based on the documents attached to the complaint—occurred the same day. But for the other flaws in Count VI, that would be enough even under the heightened standard of Rule 9(b) to plausibly suggest an intent not to perform a promise at the time made. *See Steele Software*, 154 Md. App. at 149 (citing *Tufts v. Poore*, 219 Md. 1, 10, 147 A.2d 717 (Ct. App. 1959)).

circumstance here is much more nuanced and the Court would not be inclined to dismiss on the technical application of the elements of fraudulent inducement.

Count VI will be dismissed for failure to plausibly allege with sufficient particularity under Rule 9(b) the circumstances of fraud to support the Debtor's inducement claim.

### H. Count VII: Negligent Misrepresentation

Count VII seeks relief against both Defendants for negligent misrepresentation. Again, the Debtor's common law tort claim is governed by Maryland law which requires the following elements to assert a claim for negligent misrepresentation:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Lloyd v. General Motors Corp.,* 397 Md. 108, 135-36, 916 A.2d 257 (Ct. App. 2007) (citations omitted) (internal quotation marks omitted).

The Defendants contend that Count VII should be dismissed because it is barred by the economic loss doctrine in that the Debtor is seeking damages for purely economic harm and the nature of the parties' relationship is not one that would fall within a recognized exception to the rule. Dismissal of Count VII, however, does not turn on whether a duty was owed to the Debtor or the nature of the damages sought. Rather, it is the nature of the representation itself that

makes it not actionable for negligent misrepresentation. *200 N. Gilmor, LLC v. Capital One,* 863 F. Supp. 2d 480, 493 (D. Md. 2012); *see also Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.,* 264 F. Supp. 2d 282, 291 (D. Md. 2003), *Miller v. Fairchild Indus.,* 97 Md. App. 324, 346, 629 A.2d 1293 (Ct. Spec. App. 1993).

As the court in *200 North Gilmor* explained, a "breach of a promise to render a performance in the future is redressable only by an action in contract" unless the "promissory representation [is] made with an existing intention not to perform[.]" 863 F. Supp. 2d at 492. "But, a promise made with the present intention not to perform is perforce, an intentional misrepresentation, not a negligent one, and thus cannot sustain an action for negligent misrepresentation." *Id.* at 493 (citing *Miller,* 97 Md. App. at 346). Rather, a promise made with the present intention not to perform is actionable for fraud. *Id.* at 492-93. Because tort actions based on promissory representations about future performance as part of a contract are limited to fraud, relief is not available under a theory of negligent misrepresentation. *Id.*

Count VII does not allege fraud and likewise does not allege the circumstances of the misrepresentations with the particularity that would be required under Rule 9(b) for a fraud claim. *Heritate Oldsmobile-Imports,* 264 F. Supp. 2d at 291. Because the allegations of Count VII are insufficient to support an action for negligent or fraudulent misrepresentation, Count VII will be dismissed as to both Defendants.

*I.  Count VIII: Violations of the ICFA*

Count VIII seeks to hold both Defendants liable for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act. The Defendants assert several arguments for dismissal of Count VIII but primarily contend that relief under the ICFA is not available to the Debtor here based on the choice-of-provisions of the original contract between the Debtor and SBFS that provide for all claims, including those under statute, to be governed by Maryland law. In its response to the Motion to Dismiss, the Debtor counters that Illinois law is applicable to its breach of contract and tort claims but does not specifically address the Defendants' argument in relation to the statutory claim. It is a distinction of little difference because, as set forth above, the Court has carefully considered the choice-of-law issue and determined that all the Debtor's nonbankruptcy causes of action are governed by Maryland law per the parties' original contract.

As discussed, the Illinois appellate court in *Hall* considered the application of a choice-of-law provision regarding claims brought under the ICFA. *Hall,* 376 Ill. App. 3d at 823-24. There, the court found that the parties' agreement expressly contemplated that Kansas law would govern the agreement and related disputes. Finding no public policy against applying a foreign state's consumer protection laws or that Illinois had a materially greater interest in the litigation, the court upheld the choice-of-law provision to apply the Kansas consumer protection laws even though the laws might not otherwise apply. *Id.* at 825-29.

Thus, the ICFA would not apply to the present parties' disputes and Count VIII should be dismissed.

It is not clear that the Debtor could state a claim for relief under a comparable Maryland statute based on the same or similar allegations, so the Court cannot simply construe the claim as one under Maryland law. For instance, the Maryland Consumer Protection Act appears to apply to parties and transactions that are more narrowly defined than under the ICFA. *See generally* Md. Code. Com. Law §13-101 to 13-101.1; *D&G Flooring, LLC v. Home Depot USA, Inc.,* 346 F. Supp. 2d 818, 822-23 (D. Md. 2004). There are, however, several Maryland statutes that contain provisions governing consumer and commercial transactions, and this Court will not speculate under which statutes, if any, the Debtor might have stated a claim for relief. All that can be said about Count VIII is that the Illinois consumer fraud statute does not apply to the Debtor's dispute with the Defendants and it is therefore properly dismissed.

### *J. With or Without Prejudice*

The only question that remains is whether the Debtor should be granted leave to file a fifth amended complaint. Naturally, the Defendants seek dismissal with prejudice. The Debtor did not address the issue in its response to the Motion to Dismiss. The federal rules provide that leave should be granted freely when justice so requires. Fed. R. Civ. P. 15(a)(2); Fed. R. Bankr. P. 7015. Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment[.]" *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC,* 499 F.3d 663, 666 (7th Cir. 2007) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). Generally, delay on its own is not sufficient grounds for denying leave to amend and must be coupled with some other reason. *Id.* at 667.

The proceeding before the Court was commenced November 15, 2023, by the filing of the original complaint. In the nearly two years the proceeding has been pending, the Debtor has amended its complaint four times. The first two amendments came after the Defendants filed their answer to the original complaint. Several counts in the second amended complaint were dismissed on the Defendants' motion after being fully briefed and argued by the parties. In its Opinion and Order on dismissal of the second amended complaint, the Court granted the Debtor leave to file a third amended complaint given that it was the first time a motion to dismiss had been heard in the case and finding that the Debtor should have an opportunity to amend and replead some of the dismissed counts if possible. In doing so, the Court admonished the Debtor about the apparent lack of attention to basic details in its pleading and advised that serious investigation of the facts and available relief was needed before filing an amended complaint. *ACJK,* 2024 WL 4047140, at *12.

The third amended complaint was seriously lacking and likely would have been dismissed in large part had it been challenged by the Defendants. But shortly after filing the third amended complaint, counsel moved to withdraw from

representing the Debtor, which ultimately led to replacement counsel being hired who was then given additional time to decide whether to proceed on the pending third amended complaint. Counsel for the Debtor opted to file a motion to voluntarily dismiss the third amended complaint without prejudice so that the Debtor might instead pursue available relief in state court. The Defendants objected to that motion, arguing that it would suffer great prejudice if forced to start over defending against litigation filed in another forum, noting the time invested and expenses incurred defending the action in bankruptcy court over the previous seventeen months and attaching a declaration as to the time and money spent to date. After concerns were raised by the Defendants as well as the Court, the Debtor moved to withdraw the request for voluntary dismissal and sought leave to file a fourth amended complaint.

As the Court pointed out at a hearing on the motion for leave to file a fourth amended complaint, the draft of the complaint attached to the motion contained a glaring error—it simply incorporated the allegations of the prior complaints that the Debtor made the payment at issue despite the intervening revelation that the Pelates had made the payment from their personal account. The Court expressed concern about the continued failure to carefully investigate the allegations being made in drafting a complaint but gave the Debtor even more time to try again. The Fourth Amended Complaint that was ultimately filed and is now before the Court corrected the allegations about who made the payment but otherwise adopted many of the same generic allegations from prior complaints without further development.

Without question the resolution of this proceeding on the merits has been delayed by the Debtor's inability to get past the pleading stage of litigation. As the facts and claims asserted have evolved, the Court has been steadfast in calling attention to deficiencies and the need for meaningful investigation and careful drafting of a proper complaint. Each successive complaint, however, in large measure failed to address the Court's concerns. The principle that leave to amend be freely granted is not unlimited and does not require repeated opportunities for litigants who show little ability or inclination to put forth a complaint that complies with applicable standards. *Stanard v. Nygren*, 658 F.3d 792, 801 (7th Cir. 2011).

Although the Fourth Amended Complaint was the first filed after the Debtor's former counsel withdrew from the case, the newly-appointed counsel who filed it was fully apprised of the issues outlined in the Court's Opinion and Order on dismissal of the second amended complaint, the problems with the third amended complaint aggravated by the late change in material facts raised by the Chapter 13 trustee's complaint in the Pelates' bankruptcy, and the Court's overall concerns with the case. The Court also specifically admonished him before he sought leave to file a fourth amended complaint that it would likely be the last opportunity to amend the complaint and that dismissal at this juncture would likely be with prejudice. Even so, when counsel filed his motion for leave to amend with the proposed fourth amended complaint attached that failed to cure the most glaring problem with the third amended complaint, the Court brought the issue to counsel's attention and gave him an opportunity to try

again. Counsel did correct the glaring factual mistake in his second attempt. But, despite adding several counts involving fraud that are subject to the heightened pleading standard of Rule 9, the Fourth Amended Complaint otherwise merely incorporated the same conclusory allegations asserted in prior complaints that the Court previously found barely met the more liberal pleading standard of Rule 8.

The Defendants have already been prejudiced by the pleading failures and resulting delays in this proceeding. In his declaration attached to the Defendants' objection to the Debtor's motion to voluntarily dismiss the third amended complaint without prejudice, the Defendants' counsel attested to fees and costs incurred defending the litigation totaling more than $51,000. That sum has undoubtedly grown with additional fees incurred from filing the Motion to Dismiss the Fourth Amended Complaint and fully briefing the issues therein. Having to defend against another amended complaint when prior amendments showed no signs of improvement would likely result in further prejudice to the Defendants.

Further, the Debtor has not asked—in its response to the Motion to Dismiss or otherwise—for leave to amend further in the event of dismissal and has not suggested how inadequacies might be corrected by amendment. The Seventh Circuit has made clear that "[n]othing in Rule 15, nor in any of our cases, suggests that a district court must give leave to amend a complaint where a party does not request it or suggest to the court the ways in which it might cure the defects." *Haywood v. Massage Envy Franchising, LLC,* 887 F.3d 329,

335 (7th Cir. 2018). This is particularly true for claims that a party fails to defend, like Count V here.

Finally, amending Counts II, V, VII, and VIII appears to be futile. The fact that the Pelates made the $15,574.78 payment is fatal to the equitable subordination claim. The Debtor has acknowledged that negligent interference is not a recognized claim for relief. The negligent misrepresentation claim is precluded by the fact that it is based on the contractual promise to perform. And the claim under the Illinois fraud protection statute is precluded by the application of Maryland law to govern the parties' relationship. None of these deficiencies are curable by amendment.

Because the Debtor has failed to show it can put forth a cognizable claim other than for breach of contract despite several opportunities for amendment, all the while causing undue delay and prejudice to the Defendants, the dismissal of Counts II, III, IV, V, VI, VII, and VIII will be with prejudice. *Airborne Beepers & Video*, 499 F.3d at 667 (citing *Dubicz v. Commonwealth Edison Co.,* 377 F.3d 787, 793 (7th Cir. 2004)). The futility of amendment is a separate basis for dismissing Counts II, V, VII, and VIII with prejudice.

## IV.    Conclusion

Counts II, III, IV, V, VI, VII, and VIII will be dismissed with prejudice. The dismissals with prejudice are based on this being the fifth attempt by the Debtor to set forth plausible claims for relief and the Defendants twice having filed a motion to dismiss and incurring significant fees and costs without any

meaningful progress toward a complaint that states anything other than a claim for breach of contract. The parties have wasted significant time and expense over a $15,000 payment and an unreleased lien. The Debtor has long contended that the Defendants should be held liable for damages in excess of $1 million resulting from the Debtor's failed sale of assets to Walgreens. Yet the Debtor declined to take the time to develop its claims, notwithstanding the Court's urging and the amount of money thought to be at stake. To the contrary, each amendment since the Defendants answered the original multi-count complaint has resulted in dismissal of more claims than the one before it. There is little hope that further amendment would yield better results.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.


ENTERED: September 8, 2025

/s/ Mary P. Gorman
_____
UNITED STATES BANKRUPTCY JUDGE